## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DANIEL SIMMONS,                          :
                    Plaintiff,

v.                                       :          Case No. 1:07 cv 00493
                                                    JUDGE JAMES ROBERTSON
DISTRICT OF COLUMBIA                     :
And JOHN DOES 1-5,
            Defendants.                  :

### NOTICE OF FILING

Attached herein are Plaintiffs Exhibits 1,2,3 and 5 to Plaintiff's Opposition to Defendant,

District of Columbia, Motion to Dismiss the Complaint, which were not attached to said

Opposition.


                                   Respectfully,

                                        /s/
                                   Joan A. Harvill
                                   D.C. Bar No. 309112
                                   Attorney for Plaintiff
                                   1629 K Street, N.W.
                                   Suite 300
                                   Washington, D.C. 20006
                                   (202) 466-6346

GENERAL ORDER

| SERIES | NUMBER | EFFECTIVE DATE |
|--------|--------|----------------|
| 304 | 10 | July 1, 1973 |

| SUBJECT: | DISTRIBUTION |
|----------|--------------|
| | A |
| Police-Citizen Contacts, Stops and Frisks | ORIGINATING UNIT |
| | OGC |

The purpose of this order is to establish policies and procedures governing police-citizen "contacts," stops and frisks. Policies and procedures concerning arrests and searches connected with arrests are not covered. This order is intended to promote public safety and to safeguard members of the department from injury, while ensuring that invasions of personal privacy of members of the public will be held to a minimum. This order consists of the following parts:

PART I    Responsibilities and Procedures for
          Members of the Department

          A.    Contacts.
          B.    Stops.
          C.    Frisks.
          D.    Record Keeping.

PART I

A.    Contacts.

          Conduct by an officer which places the sworn member in face-to-face communication with an individual citizen under circumstances in which the citizen is free not to respond, and to leave, is considered a "contact." Contacts may be initiated by a officer when he/she reasonably believes that some investigatory inquiry into a situation is warranted. Since a contact involves solely the voluntary cooperativeness of a citizen who is free not to respond and to leave, the standard for a police-citizen contact does not require "probable cause," "reasonable suspicion," or any other specific indication of criminal activity. While an officer may initiate a contact for any legitimate, police-related purpose, contacts shall not be conducted in a hostile or aggressive manner, nor as a means of harassing any citizen or attempting to coerce a citizen to leave an area. Contacts shall not be initiated merely because a person is "hanging around," "loitering," or "standing on the corner," unless the overall circumstances are such as would reasonably arouse the curiosity, concern, or suspicion of the officer.

          1.    Initiating a Contact.

          An officer may initiate a contact with a person in any place in which the officer has a right to be. It is difficult to define precisely such places. Generally, they may include:

                a.    Areas of government-owned or possessed property normally open to members of the public;

                b.    Places intended for public use, or normally exposed to public view;

                c.    Places to which the officer has been admitted with the consent of the person empowered to give such consent;

PLAINTIFF'S
EXHIBIT

NO.  1

6

## CHAPTER II

2.1:8   Members of the force shall not be concerned, directly or indirectly, in making any compromise or arrangement, between suspected violators of the law and persons who are alleged to have suffered by their acts.

2.1:9   Members of the force shall not communicate, verbally or in writing, directly or indirectly, in any manner or form, any information which may enable persons guilty of criminal or quasi-criminal acts to escape arrest or punishment, or dispose of or secrete any money or other valuables, the proceeds of crime, or to destroy any evidence which would establish guilt.

2.1:10   Members of the force shall not, except by permission of a superior officer, communicate to anyone but a member of the force any information respecting specific orders he has received, or about his contemplated movements.

2.1:11   Members of the force shall not serve civil process; nor shall they render assistance in civil cases. They shall, however, prevent breaches of the peace and quell disturbances growing out of such matters and protect United States Marshals in the discharge of their duties.

2.1:12   Members of the force shall not smoke, nor carry unlighted cigars, pipes, or cigarettes in their mouths while in uniform on any public space except between the hours of 12 midnight and 8:00 A.M. They shall not during these permissible hours or at any other time smoke or carry unlighted cigars, pipes, or cigarettes in their mouths if on detail at any public or private assembly, while directing traffic, or while engaged in conversation with citizens or superior officers. The term "public space" as used in this section shall be held to include streets, sidewalks, tree space, public parking and public parks, but shall not include alleys or courts. Smoking in storerooms and garages shall not be permitted at any time.

2.1:13   Members of the force shall familiarize themselves with the statutes, laws, and regulations in force in the District of Columbia, and failure to do so, or to take action respecting violations of such statutes, laws, and regulations coming to their attention or about which they have knowledge will be deemed neglect of duty.

2.1:14   Members of the force and employees of the department shall not intentionally come in contact with persons suffering from diphtheria, scarlet fever, smallpox, or other contagious diseases, or with those in attendance on such persons, except by authorization of a member of the Board of Police and Fire Surgeons.

2.1:15   When a member of the force has come in direct contact with a patient having a contagious disease, or has been exposed to contagion, he shall at once notify his police surgeon and comply with instructions.

2.1:16   Members of the force shall be vigilant in the matter of locating persons suffering from malignant, infectious, or epidemi-

-11-

     6.   On the occurrence of a disturbance, it is the duty of the police to restore order and disperse the crowd by efforts of persuasion, if possible. If such efforts fail, force must be used and the principals arrested.

     7.   Members shall not use unnecessary force in making arrests or in dealing with prisoners or any person. Prisoners and suspects shall be treated in a fair and humane manner. They shall not be humiliated, ridiculed, taunted, or embarrassed. Members shall not strike or use any form of physical force on a prisoner or other person except when necessary to prevent escape or in self-defense or to prevent violence to another person. Members shall report each instance of their use of force to a superior officer as soon as possible.

     8.   In the arrest, transportation, and detention of prisoners, members shall take precautions to prevent an escape, injury to themselves or others, or damage to property. When making arrests, they shall search prisoners carefully and shall immediately take possession of all weapons and evidence.

     9.   Immediately upon an arrest being recorded, inquiry shall be made of prisoners as to the person or persons they may wish notified of the arrest; and the station clerk shall at once make every reasonable effort to communicate with such person or persons, except where such action might serve to defeat the ends of justice or entail expense to the District. However, whenever practicable, prisoners shall be required to use public pay telephones for such notifications; and in no case shall a prisoner be permitted to incur toll or long distance charges against the department for such purposes.

     10.   Prior to questioning an arrested person, the arresting member shall warn the person of his rights using PD Form 47 as required.

     11.   Members shall not conduct their interrogations of suspects in a manner that would tend to compel a confession. They shall not use physical violence on



PLAINTIFF'S EXHIBIT
2

METROPOLITAN POLICE DEPARTMENT
Washington, D.C.

TRAINING DIVISION



# LAWS OF ARREST, SEARCH AND SEIZURE HANDOUT



PLAINTIFF'S
EXHIBIT
3

PART I.    PROBABLE CAUSE

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."    [Fourth Amendment, Constitution of the United States]

In order to make a meaningful examination of the Fourth Amendment requirements in regard to arrest and search issues, it is important to first discuss the meaning of the rather nebulous term, "probable cause".

"Probable cause" has been defined as "a set of facts and circumstances, or reliable information that would lead a reasonable, prudent, and cautious officer to believe that a crime had been committed and a certain person committed it." (Stacy v. Emery).

Probable cause is not legal hocus pocus nor is it a complex formula understandable only to those trained in the law.  In fact, "in dealing with probable cause; however, as the very name implies, we deal with probabilities."  These are not technical - they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. (Brinegar v. U.S.)

Probable cause is based on facts, known to the officer at the time of the arrest, which would lead an experienced officer to believe that an individual committed a crime.  With the exception of illegally obtained evidence, the courts will consider any fact known to the officer at the time of the arrest. These facts could include:

A.    Evidence from the officer's own observation.
      This includes facts observed by or known to the officer personally.
      Examples would be:

      ● flight of a suspect when approached by police
      ● physical clues (e.g., fingerprints)
      ● voluntary admissions by a suspect
      ● suspicious or surreptitious conduct
      ● a suspect's previous criminal record, or
      ● a suspect's presence in a high crime area.

Keep in mind that one of these facts, by itself, will not normally be enough to establish probable cause; each one, though, in conjunction with other known facts or information, could be a "building block" that would lead to the finding of probable cause by an experienced police officer.

Thank you for using NewsLibrary

# Washington Times, The (DC)

## D.C. inmate suits rack up millions

### City has settled dozens since '04

May 24, 2007
Section: PAGE ONE
Page: A01
Byline: By Jim McElhatton, THE WASHINGTON TIMES

**Legal** settlements from accusations of civil rights violations, negligence, assaults and other complaints against the D.C. Department of Corrections are costing city taxpayers millions of dollars.

Payments include $18,500 to an inmate who said his finger was severed when a corrections officer shut a gate on his hand, $12 million on behalf of thousands of inmates subjected to illegal strip-searches and detained for too long, and $1 million to the family of Jonathan Magbie. a paralyzed inmate who died while **in** custody.

Records obtained by The Washington Times through the Freedom of Information Act show that since fiscal 2004, the **District** has authorized dozens of payments to settle lawsuits against the corrections department.

So far, there have been nine settlements **in** 2007. including $1 million to settle Mr. Magbie's case. Sentenced to 10 days **in** jail for marijuana possession **in** 2004, the quadriplegic died **in** custody after having breathing problems.

There were $12.6 million **in** settlements paid out **in** fiscal 2006, the most costly a $12 million payment to settle a class-**action** suit filed on behalf of thousands of inmates over illegal strip-searches and overdetentions.



"One way of looking at it is the cost to taxpayers," said **D.C.** Council member Phil Mendelson. at-large Democrat and chairman of the council's judiciary committee. which oversees the jail. "But the bigger cost is if people's constitutional rights are being violated."

Devon Brown, who became director of the department last year, said yesterday that he and senior staffers review each lawsuit that results **in** settlements or judgments "to improve our operations."

Without commenting on specific suits, he said some cases have resulted **in** personnel changes.

The **District** is not alone **in** struggling with inmate lawsuits. Corrections Professional. a trade industry publication, last year reported that inmate

lawsuits claiming excessive force were escalating across the country and draining budgets.

In fiscal 2005, the **District** settled 22 lawsuits filed against the department that resulted in more than $1.6 million in payments. Of 41 cases in 2004, the largest was a $500,000 payment to settle claims of negligent hiring and training.

George C. Valentine, deputy attorney general for the **District**, said he could not comment on individual settlements because of the confidential attorney-client privilege.

However, he said attorneys' deciding whether to settle cases generally weigh such factors as the merits of the claim, input from city agencies and likely outcomes.

"We ask what's the likelihood of us prevailing in front of a jury," he said. "Sometimes we feel it's in the best interest of the public to resolve a case."

He also said the **D.C.** Attorney General's Office tries to help agencies limit their chances of being sued by alerting them about trends in the type of cases being filed against the **District**.

"There's constant discussion," he said. "Part of what we do is risk management in the context of defending cases."

Several of the larger settlements in the corrections department in recent years stem from claims of illegal strip-searches and overdetentions.

In 2005, the **District** paid $1.1 million to settle a lawsuit filed by Joseph Heard, a deaf and mute inmate who was mistakenly kept nearly two years past his release date.

In 2004, the **District** paid $105,000 to settle a lawsuit filed after officers performed a strip-search of students during a tour of the jail for a class trip.

In addition, more than a dozen inmates were paid settlements in recent years over lawsuits that stated negligent supervision played a role in inmate-on-inmate attacks.

Moreover, the **District** paid $11,500 last year to settle a lawsuit claiming that the department was negligent in disposing of a cremated body.

The department also faces the possibility of another costly lawsuit after a federal judge in March granted class-**action** status to a suit filed by more inmates saying they were detained after their release dates.

**U.S. District** Judge Royce C. Lamberth said the **District** had adopted a policy of keeping inmates set for release in a holding area inside the old **D.C.** General Hospital compound, separate from the jail, while their paperwork is

processed.

"But sometime around December 2005, cracks **in** the system began to widen,
with more and more inmates who were entitled to release slipping through
and being returned to the **D.C**. Jail," the judge wrote.

Mr. Brown said overdetentions involve a larger issue of communication
between the corrections department and other agencies, such as the **courts**
and U.S. Marshals Service.

"It's not only the Department of Corrections that causes or participates **in**
these situations," he said.

Some of the settlements stemmed from accusations of poor medical care, an
issue that prompted a **court**-ordered receivership from 1995 to 2000. The
**District**-based nonprofit Unity Health Care recently took over health care
services for inmates under a city contract.

All content Copyright 2006 The Washington Times LLC and may not be republished without
permission.

'?